The Court has received no objections to the Report and Recommendation ("R&R").  I have reviewed it for clear error and find none.  Accordingly, the R&R is adopted as the decision of the Court.  Defendant's motion for judgment on the pleadings is denied and the case is remanded for further administrative proceedings.

UNITED STATES DISTRICT COU
SOUTHERN DISTRICT OF NEW Y

SO ORDERED.

-------------------------------------------------

ELIZABETH ROSE RIZZO,

*Catthy Seibel*

CATHY SEIBEL, U.S.D.J.

Plainti

**REPORT AND**
**____COMMENDATION**

-against-

August 17, 2017

16 Civ. 4898 (CS) (PED)

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,[1]

Defendant.

---------------------------------------------------X

TO THE HONORABLE CATHY SEIBEL, United States District Judge:

## I.  INTRODUCTION

*Pro se* plaintiff Elizabeth Rose Rizzo brings this action pursuant to 42 U.S.C. §§ 405(g)

and 1383(c) seeking judicial review of a final determination of the Commissioner of Social

Security (the "Commissioner") denying her application for disability benefits.[2]  The matter is

before me pursuant to an Order of Reference entered July 1, 2016 (Dkt. #7).  On November 22,

---

[1]  Nancy A. Berryhill is now the Acting Commissioner of Social Security and is substituted for former Acting Commissioner Carolyn W. Colvin as the Defendant in this action, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2]  Plaintiff alleges entitlement to two types of disability-related benefits under the Social Security Act:  Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Because the definition of "disabled" governing eligibility is the same for DIB and SSI, the term "disability benefits" refers to both.  See Paredes v. Comm'r of Soc. Sec., No. 16 Civ. 810, 2017 WL 2210865, at *1 n.1 (S.D.N.Y. May 19, 2017); 42 U.S.C. §§ 423(d), 1382c(a)(3).

Copies of all unpublished opinions and decisions available only in electronic form cited herein have been mailed to plaintiff.  See Lebron v. Sanders, 557 F.3d 76, 78 (2d Cir. 2009).

2016, the Commissioner filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Dkt. #11 (motion), #12 (memorandum of law in support)). Plaintiff's time to respond expired without response.  In recognition of her *pro se* status, I issued an Order on April 20, 2017 (Dkt. #14) granting plaintiff an additional thirty days, until May 22, 2017, to file any opposition and advising her that if she did not oppose defendant's motion, the Court would decide the motion based solely on defendant's submissions.  To date, plaintiff has not filed any opposition, nor has she contacted my chambers in any fashion.  Nonetheless, for the reasons set forth below, I respectfully recommend that defendant's motion be **DENIED** and the case **REMANDED** pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings.

## II. BACKGROUND

The following facts are taken from the administrative record ("R.") of the Social Security Administration, filed by defendant on September 26, 2016 (Dkt. #10).

A. Application History

Plaintiff was born on April 18, 1980.  R. 62, 125.  On or about February 26, 2013, plaintiff applied for disability benefits, alleging that she had been disabled since July 15, 2012 due to bipolar disorder, anxiety and ovarian cysts.  R. 62, 72, 125, 145.  Her claims were administratively denied on or about May 29, 2013.  R. 84, 88, 89.  On or about June 28, 2013, plaintiff requested a hearing before an administrative law judge ("ALJ").  R. 90.  That hearing was held on March 14, 2014, before ALJ Katherine Edgell.  R. 30-61.  Plaintiff appeared with counsel and testified at the hearing.  R. 32-60.  On October 15, 2014, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social

Security Act ("SSA"). R. 14-25. The ALJ's decision became the final order of the

Commissioner on April 21, 2016, when the Appeals Council denied plaintiff's request for

review. R. 1-6. This action followed.

B. Function Reports

   *1. Plaintiff*

On March 15, 2013, plaintiff completed a function report with assistance from her

mother-in-law (Frances Rizzo). R. 167-77. According to plaintiff, her symptoms began in 2010

when she went back to college. R. 175. By July 2012, she was experiencing "full blown" panic

attacks, anxiety and bipolar symptoms. Id. Her panic attacks occur daily; during a typical one,

her heart races, she can't breathe, she feels dizzy, confused, scared and she might start crying.

She stays inside most of the time due to her anxiety and depression, and has difficulty sleeping.

R. 168.

Plaintiff reported that she lives in an apartment with family, and helps her husband (who

is disabled). R. 167-68. She has no difficulty taking care of her personal needs; she walks the

dog accompanied by her husband or another family member. R. 168. She is able to prepare

meals, but "sometimes it's too much to handle" and, on those occasions, her mother or mother-

in-law cooks. R. 169-70. Plaintiff is able to wash clothes and clean house, although it may take

her awhile to finish and sometimes she cannot concentrate so she "just give[s] up." R. 169.

Plaintiff needs reminders to take her medication (notes or an "app"). R. 170. She has a driver's

license but, because of her medication, she rarely drives. R. 171. She shops for food once a

week and goes to doctors once or twice a week; she is able to pay bills, count change and handle

a savings account. R. 169, 171-72. She does not spend time with others, except for visiting her

mother-in-law "maybe once a week." R. 172. Plaintiff reported no exertional limitations, except

needing to rest for a few minutes after walking three blocks ("if I even go outside–that's not often"). R. 174. She reported not fully comprehending what people say to her, and procrastinating "all the time." Id. She is able to follow spoken and written directions "if fully explained" to her, although her "mind wanders from one thing to the next." Id. She reported problems getting along with bosses and co-workers; she quit her last job because of harassment from her boss and co-workers and "walked off" another job "long ago" because she "couldn't deal with it anymore." Id. Plaintiff has trouble remembering things because her "mind is always racing." R. 175. Stress makes her "angry enough to punch walls, scream, bug out [and] kick things." Id.

   *2. Frances Rizzo*

   Plaintiff's mother-in-law, Frances Rizzo, completed a function report on March 20, 2013. R. 186-93. Ms. Rizzo stated that she spends time with plaintiff every day (they eat together and talk). R. 186. According to Ms. Rizzo, plaintiff spends "lots of time in bed" unless Ms. Rizzo goes over for a visit. R. 187. Ms. Rizzo stated that plaintiff helps take care of her husband and (sometimes) the dog, with assistance from plaintiff's father or Ms. Rizzo. Id. She reported that plaintiff cooks every day except Sunday, although she uses more canned/prepared foods and it takes her a long time because she has to think about how to prepare the food. R. 188. Plaintiff needs help and/or encouragement doing household chores ("she'll do it only if she has to"); it takes plaintiff one week to do a household chore that she used to do in one day. Id. To Ms. Rizzo's knowledge, plaintiff rarely goes outside (and only if someone is with her). R. 189. She goes food shopping once a week (with company); she is able to pay bills, count change, use a checkbook and handle a savings account. Id. Plaintiff spends her days watching television, using the computer or sleeping. R. 190. She does not socialize and does not get along with

people. R. 190-91. Ms. Rizzo noted that plaintiff is moody and her mind wanders; she has difficulty paying attention and remembering things. R. 191. Plaintiff does not finish what she starts (e.g. a conversation, chores, reading, watching a movie); she does not follow written instructions and has a lot of difficulty following spoken instructions. Id. According to Ms. Rizzo, plaintiff has difficulty handling stress and changes in routine; she does not get along well with authority figures (because she cannot communicate and loses her temper) and she lost her job at the bank because of problems getting along with others. R. 192.

C.  Treatment Records

The administrative record contains treatment notes, psychological assessments, diagnostic imaging reports and lab results from Montefiore Medical Center (Bronx), Montefiore New Rochelle Hospital, Montefiore Mount Vernon Hospital, Herold Abellard, M.D., Licensed Clinical Social Worker ("LCSW") Lynn Gonzalez, LCSW Carolyn Stilman and LCSW Mario J. Passaro for treatment provided to plaintiff from November 21, 2012 to April 14, 2014.[3] The following is a distillation of their relevant points.

1.  *Claimed Physical Disability: Ovarian Cysts*

On November 21, 2012, plaintiff was examined by gynecologist Dr. Julia Gray at Montefiore Medical Center's Larchmont Women's Center. R. 350-52. Plaintiff reported a history of endometriosis and ovarian cysts, and complained of increased pelvic pain ("especially

---

[3]  I have disregarded treatment records from Dr. Mark Weigle, Dr. Zoovia Hamid and Montefiore New Rochelle Hospital documenting short-term treatment rendered to plaintiff in response to her complaints of sinus congestion/cough, hypoglycemic episodes, back pain, wrist pain, shoulder pain, migraines and dizziness (R. 390-97, 400-01, 404, 407-08, 412-18, 552-86, 627-43) because they are irrelevant to plaintiff's claimed disabilities.

dyspareunia and dysmenorrhea"). R. 350.[4]  Examination results were unremarkable; Dr. Gray

referred plaintiff to Dr. Kristin Patzkowsky for an endometriosis consult. R. 347, 352.

Plaintiff met with Dr. Patzkowsky on January 8, 2013. R. 347-49.  Plaintiff reported

bilateral pelvic pain one to two weeks prior to onset of menses (worsening with menses) and

dyspareunia. R. 347.  Dr. Patzkowsky ordered a pelvic ultrasound and advised plaintiff to

schedule a follow-up appointment in two to three weeks. R. 349.

On January 9, 2013, plaintiff underwent a transvaginal sonogram which showed

"[b]ilateral adnexal lesions . . . consistent with bilateral endometriomas." R. 353-55.  She

returned to Dr. Patzkowsky on January 22, 2013. R. 344-46.  Based on the ultrasound results,

Dr. Patzkowsky recommended surgery to remove the bilateral ovarian cysts. R. 345.  She

performed bilateral ovarian cystectomies on February 15, 2013. R. 287-97.

On March 1, 2013, plaintiff returned to Dr. Patzkowsky for a post-operative examination.

R. 341-43.  Plaintiff was "doing well" and her pain was "adequately controlled with [post-

operative] percoset/ibuprofen." R. 341.  Dr. Patzkowsky reassured plaintiff regarding "normal

post-op recovery symptoms" and noted "[n]o specific follow-up needed for this problem." R.

342.

2.  *Claimed Mental Disabilities: Bipolar Disorder and Anxiety Disorder*

On December 4, 2012, plaintiff sought treatment from (and was initially evaluated by)

psychiatrist Dr. Herold Abellard "due to issues with depression." R. 683-88.  Plaintiff reported

that she was bipolar with a long history of depression, and that she used to take Prozac® but was

---

[4]  Dyspareunia is defined as "[d]ifficult or painful sexual intercourse." *The American Heritage® Stedman's Medical Dictionary*, Houghton Mifflin Company, accessed at Dictionary.com, http://www.dictionary.com/browse/dyspareunia. Dysmenorrhea is defined as "painful menstruation." Id., accessed at http://www.dictionary.com/browse/dysmenorrhea?s=t.

not currently taking psychiatric medication. R. 683-84. She complained of "constant anxiety with insomnia." R. 683. Dr. Abellard noted that plaintiff was casually dressed and well-groomed. R. 686. She was cooperative, with good eye contact and normal motor activity. Id. Her speech was normal; she was oriented to date, person and place, and her long-term and short-term memory were good. Id. Her thought process was coherent; Dr. Abellard noted no delusions, hallucinations/illusions, phobias/obsessions or suicidal/homicidal ideations. R. 687. Plaintiff's affect was full and appropriate but her mood was anxious. Id. Her insight, judgment and impulse control were fair. R. 687-88. Dr. Abellard rated plaintiff's global assessment of function ("GAF") at 60. R. 688.[5] He diagnosed mood disorder NOS[6] and a possible history of bipolar disorder. Id. Dr. Abellard prescribed Ativan® and referred plaintiff to Alsarro Counseling Services ("Alsarro Counseling"). Id.[7]

Plaintiff returned to Dr. Abellard on December 11, 2012. R. 682. Her mood was neutral, her affect, psychomotor activity and speech were within normal limits, her thought processes

---

[5] "GAF is a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning." Petrie v. Astrue, 412 F. App'x 401, 406 n.2 (2d Cir. 2011) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 376-77 (4th ed. rev. 2000)) ("DSM-IV"). "GAF scores between 51-60 indicate that the individual has moderate symptoms or moderate difficulty in social, occupational, or school situations." Id. (citing DSM-IV at 34). "The Fifth Edition of the DSM has discarded the use of GAF Scores." Gonzalez v. Colvin, No. 14 Civ. 6206, 2015 WL 1514972, at *5 n.6 (S.D.N.Y. Apr. 1, 2015) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013)). At the time of Dr. Abellard's initial evaluation, however, the DSM-IV was still in effect.

[6] NOS is an abbreviation for "not otherwise specified." See Mitchell v. Colvin, No. 09 Civ. 5429, 2013 WL 5676289, at *2 n.4 (E.D.N.Y. Oct. 17, 2013).

[7] Ativan® is the brand name of the anti-anxiety drug Lorazepam. See MedlinePlus, a service of the U.S. National Library of Medicine and the National Institutes of Health, available at https://medlineplus.gov/druginfo/meds/a682053.html.

were organized and her insight/judgment and impulse control were good. Id. Plaintiff reported feeling "more comfortable"; Dr. Abellard noted that she was "doing remarkably well." Id. At a follow-up visit on December 18, 2012, plaintiff reported feeling "better"; Dr. Abellard noted plaintiff was "doing well" and seemed happy. R. 681.

At plaintiff's next appointment with Dr. Abellard (on January 9, 2013), she reported increased anxiety. R. 680. Her psychomotor activity and speech were within normal limits, her thought processes were organized and her insight and judgment were good. Id. Her mood and affect were anxious; her impulse control was fair. Id. Dr. Abellard increased plaintiff's medication and scheduled a re-evaluation in one month. Id.

Pursuant to Dr. Abellard's referral (R. 688), plaintiff visited Alsarro Counseling on January 14, 2013. R. 529. She reported "feeling depressed and angry for past few months" due to personal issues, feeling very stressed about money and anxious about an upcoming licensing exam. Id. Plaintiff also reported difficulty sleeping, crying spells and feeling sad/hopeless. R. 533. Upon mental status examination, LCSW Lynn Gonzalez observed that plaintiff was well-nourished and well-groomed; she was attentive and cooperative but her attitude was "guarded" and she was "fidgety." R. 529. Her speech was fluent and soft; her mood was sad, depressed, anxious and irritable, and her affect was constricted and congruent. Id. Plaintiff's thought process was logical, her perception was appropriate and her thought content was relevant. Id. She had no suicidal/homicidal ideation or intent and was oriented to person, place, time and situation. R. 529-30. Her memory was good and her attention and concentration were normal. R. 530. Plaintiff's intellectual functioning and her ability to abstract and generalize were fair; her insight, judgment and impulse control were poor. Id. LCSW Gonzalez diagnosed

dysthymia,[8] assessed a GAF score of 60 and recommended individual therapy. R. 534.

Plaintiff returned to LCSW Gonzalez on January 21, 2013. R. 535. Plaintiff's appearance was appropriate, her speech and thought content were normal and her thought process was coherent. Id. Her attitude was guarded, her mood was depressed and her affect was flat; her attention/concentration was fair and her judgment and insight were poor. Id. At her next therapy session on January 28, 2013, plaintiff reported feeling anxious (which tends to make her lash out in anger). R. 536. Her mood was anxious; otherwise, her mental assessment was unchanged. Id.

On February 4, 2013, plaintiff reported to LCSW Gonzalez that she had taken a massage therapy exam the prior week but thought she "failed again," and that she was "very angry and despairing that she will ever pass and get a job." R. 637. Plaintiff stated "that while her husband and parents are supportive, she feels that she is a failure in everything she does." Id. Plaintiff's speech was soft spoken; her appearance was appropriate, her thought content was normal, her thought process was coherent and her attention and concentration were good. Id. Her attitude was guarded, her mood was depressed, her affect was flat and her judgment and insight were poor. Id. Plaintiff did not schedule a follow-up therapy session and, instead, stated she would call to schedule her next appointment. R. 538.

Plaintiff saw Dr. Abellard twice in February 2013. R. 678-79. On February 6th, she reported "depressive symptoms." R. 679. Her mood was depressed and anxious, and her affect was anxious. Id. Her psychomotor activity and speech were normal; her thought process was organized, her insight/judgment were good and her impulse control was fair. Id. Dr. Abellard

---

[8] "Persistent depressive disorder used to be called dysthymia." MedlinePlus, at https://medlineplus.gov/ency/article/000918.htm.

continued plaintiff's prescription for Ativan® and added Abilify®. Id.[9] On February 25th,
plaintiff reported "that Abilify® did not work." R. 678. Her mood was anxious and her affect
was constricted. Id. Her psychomotor activity and speech were normal; her thought process was
organized, her insight/judgment were good and her impulse control was fair. Id. Dr. Abellard
discontinued Abilify® and prescribed Seroquel® in addition to Ativan®. Id.[10]

    That same day (February 25, 2013), pursuant to a referral from Dr. Abellard, plaintiff
was evaluated by LCSW Carolyn Stilman. R. 368.[11] In one questionnaire, plaintiff indicated
that she experienced problems "nearly every day" during the prior two weeks (little
interest/pleasure in doing things, feeling depressed/hopeless, difficulty sleeping, feeling tired,
poor appetite, feeling bad about herself or that she had let herself/her family down, trouble
concentrating, moving/speaking very slowly or the opposite–being fidgety and restless) which
made it "extremely difficult" to work, do things at home or get along with other people. R. 372.
In that same questionnaire, plaintiff indicated that she had experienced suicidal thoughts more
than half the days in the prior two weeks. Id. In another questionnaire, plaintiff indicated that
"nearly every day" during the prior two weeks she felt nervous, anxious or on edge, she worried

---

[9] Aripiprazole (brand name Abilify®) is used to treat the symptoms of schizophrenia and
bipolar disorder, and "is also used with an antidepressant to treat depression when symptoms
cannot be controlled by the antidepressant alone." MedlinePlus, at
https://medlineplus.gov/druginfo/meds/a603012.html.

[10] Seroquel® is the brand name of Quetiapine, an "atypical antipsychotic" medication
used with other medications to treat depression "and to prevent episodes of mania or depression
in patients with bipolar disorder." MedlinePlus, at
https://medlineplus.gov/druginfo/meds/a698019.html.

[11] It is unclear as to why plaintiff discontinued therapy at Alsarro Counseling. On March
20, 2013, they noted that they had not heard from plaintiff in thirty days and, accordingly, they
closed her case. R. 539.

too much and could not stop worrying, she was irritable and she felt as if something awful might happen. R. 373. She also indicated (in that questionnaire) that, on more than half the days in the prior two weeks, it was difficult for her to relax. Id. Upon mental status examination, LCSW Stilman noted that plaintiff was cooperative and maintained eye contact, her motor activity was normal and her speech was moderate. R. 370. She was oriented to person, date and place; her memory was good and she had normal intelligence and fund of knowledge. Id. Plaintiff had suicidal ideation sometimes, but not often; she had homicidal thoughts but no plans. R. 371. LCSW Stilman diagnosed bipolar disorder and panic attacks (without agoraphobia). Id.[12]

Plaintiff saw Dr. Abellard twice in March 2013. R. 676-77. On March 4th, plaintiff reported that she was "doing very well and sleep is good." R. 677. Her mood was neutral, her affect, psychomotor activity and speech were within normal limits, her thought processes were organized and her insight/judgment and impulse control were good. Id. Dr. Abellard noted: "Pt is at baseline?" Id. On March 18th, plaintiff's mental status was unchanged; Dr. Abellard noted that she "is doing well." R. 676.

On March 18, 2013, LCSW Stilman completed a functional assessment of plaintiff, co-signed by Dr. Abellard. R. 302-08. LCSW Stilman indicated that she conducted weekly therapy sessions with plaintiff, beginning on February 25, 2013. R. 302, 304. LCSW Stilman stated that plaintiff is able to perform activities of daily living ("ADLs") most of the time, but she is unable to work in a work-like setting because she "finds it difficult to leave her home." R. 306. LCSW Stilman assessed plaintiff's ability to do work-related mental activities as follows: her

---

[12] Agoraphobia is defined as a "[p]hobia of open or public places." *The American Heritage® Stedman's Medical Dictionary*, accessed at Dictionary.com, http://www.dictionary.com/browse/agoraphobia.

understanding, memory, and ability to sustain concentration and persistence are limited (due to "racing thoughts"); her social interaction is limited because she does not get along well with others; she found change difficult, which limited her ability to respond appropriately to changes in the workplace, to use public transportation, to set realistic goals and to make plans independently. R. 307.

LCSW Stilman completed a second functional assessment of plaintiff on April 26, 2013. R. 377-85. Attached to this assessment were questionnaires completed by plaintiff on April 17, 2013. R. 386-88.[13] In one questionnaire, plaintiff indicated that she experienced problems "nearly every day" during the prior two weeks (little interest/pleasure in doing things, feeling depressed/hopeless, feeling tired, feeling bad about herself or that she had let herself/her family down, trouble concentrating, moving/speaking very slowly or the opposite–being fidgety and restless) which made it "extremely difficult" to work, do things at home or get along with other people. R. 388. In that same questionnaire, plaintiff indicated that she had experienced suicidal thoughts and had difficulty sleeping more than half the days in the prior two weeks. Id. In another questionnaire, plaintiff indicated that "nearly every day" during the prior two weeks she felt nervous, anxious or on edge and she worried too much about different things. R. 387. She also indicated (in that questionnaire) that, on more than half the days in the prior two weeks, she was unable to stop worrying, she was restless and it was difficult for her to sit still, she was irritable and she felt as if something awful might happen. Id. In the second assessment, LCSW Stilman stated that she began treating plaintiff once a week on February 25, 2013, and had last

---

[13] These questionnaires were identical to the ones plaintiff completed in conjunction with her first session with LCSW Stilman on February 25, 2013. The questionnaires and LCSW Stilman's initial evaluation are the only treatment notes from LCSW Stilman in the record.

treated plaintiff on April 17, 2013.  R. 377.  According to LCSW Stilman, plaintiff has marked

limitations in ADLs (because she is too afraid to leave her house alone), in social functioning

(because she does not function independently in social situations) and in concentration,

persistence and pace (because she is unable to complete tasks).  R. 379-81.  Plaintiff cannot

travel alone on a daily basis via bus or subway due to fear.  R. 383.  LCSW Stilman assessed

plaintiff's ability to do unskilled work as follows:

> Unlimited or Very Good
> -be aware of normal hazards and take appropriate precautions
>
> Fair
> -understand, remember and carry out very short, simple instructions
> -be punctual and maintain regular attendance
> -sustain an ordinary routine without special supervision
>
> Poor
> -remember work-like procedures
> -maintain attention for two-hour segments
> -work in coordination with or proximity to others without distraction
> -make simple work-related decisions
> -complete a normal workday and workweek without interruptions from psychologically-
>     based symptoms
> -perform at a consistent pace without an unreasonable number and length of rest periods
> -ask simple questions or request assistance
> -accept instructions and respond appropriately to criticism from supervisors
> -get along with co-workers
> -respond appropriately to changes in a routine work setting
> -deal with normal work stress.

R. 384-85.  LCSW Stilman's second assessment was co-signed by Dr. Abellard, who noted "we

share this pt and I concur."  R. 385.

     During April, May and June 2013, plaintiff saw Dr. Abellard five times.  R. 671-75.  On

April 3rd, plaintiff reported that she was sleeping better but her mood was "no good."  R. 675.

Dr. Abellard increased plaintiff's dose of Seroquel®.  Id.  On April 11th, plaintiff's mood was

neutral and her affect was anxious.  R. 674.  Her psychomotor activity and speech were within

normal limits, her thought processes were organized, her insight/judgment were good and her impulse control was fair. Id. On May 13th, plaintiff reported depression, anger and difficulty sleeping, and stated that she "has not been doing too well." R. 673. Her mood was neutral and her affect was labile and anxious. Id. Her psychomotor activity and speech were within normal limits, her thought processes were organized, her insight/judgment were limited and her impulse control was fair. Id. Dr. Abellard increased plaintiff's dose of Seroquel® and noted: "We are considering hospitalization due to lack of improvement." Id. On June 5th, plaintiff's mood and affect were anxious. R. 672. She reported sleeping well; her psychomotor activity and speech were within normal limits, her thought processes were organized, her insight/judgment were good and her impulse control was fair. Id. Dr. Abellard again increased plaintiff's dose of Seroquel®. Id. On June 28th, plaintiff reported anxiety. R. 671. Her mood was neutral; her affect, psychomotor activity and speech were within normal limits, her thought processes were organized and her insight/judgment and impulse control were good. Id. Dr. Abellard further increased plaintiff's dose of Seroquel®. Id.

Plaintiff continued treatment with Dr. Abellard once each month from July through November 2013. R. 666-70. On July 19th, plaintiff's mood was neutral; her affect, psychomotor activity and speech were within normal limits, her thought processes were organized, her insight/judgment were good and her impulse control was fair. R. 670. Dr. Abellard noted that plaintiff "is at baseline." Id.[14] On August 16th, plaintiff's mental status was unchanged except that her impulse control was "good." R. 669. On September 11th, plaintiff reported difficulty sleeping. R. 668. Her mood and affect were anxious; her psychomotor activity and speech were

---

[14] The precise meaning and/or significance of Dr. Abellard's statement that plaintiff is "at baseline" cannot be ascertained from the record.

within normal limits, her thought processes were organized, her insight/judgment were good and her impulse control was fair. Id. Dr. Abellard adjusted the timing of plaintiff's doses of Seroquel®. Id. On October 9th, plaintiff's mood was neutral; her affect, psychomotor activity and speech were within normal limits, her thought processes were organized, her insight/judgment were good and her impulse control was fair. R. 667. Dr. Abellard noted that plaintiff "is at baseline." Id. On November 6th, plaintiff's mental status was unchanged except for her impulse control, which was "poor." R. 666. Dr. Abellard again noted that plaintiff "is at baseline." Id.[15]

On November 22, 2013, Alsarro Counseling reopened plaintiff's case and transferred her to LCSW Mario J. Passaro. R. 541.[16] Plaintiff met with LCSW Passaro on November 27, 2013. R. 542. She reported "symptoms of anxiety and how she tends to break things when she is angry." Id. Plaintiff was cooperative, her speech was normal and she demonstrated full range of affect. Id. Her thought process was coherent and her thought content was normal. Id. Her mood was irritable and anxious; her attention, concentration and judgment were good and her insight was fair. Id.

On November 30, 2013, plaintiff went to the emergency room at Montefiore New Rochelle Hospital and stated "I'm going crazy" and "I need help." R. 590. 598. She complained

---

[15] This is puzzling, given the change in plaintiff's impulse control.

[16] According to plaintiff, she had been treating with LCSW Stilman since February 2013 but, due to insurance issues, she switched to LCSW Passaro. R. 46-48. There is no indication in the record that plaintiff continued treatment with LCSW Stilman after she began treating with LCSW Passaro. Nonetheless, LCSW Stilman submitted two medical source statements: one dated December 30, 2013 (approximately one month after plaintiff began treatment with LCSW Passaro) and one dated January 13, 2014. R. 318-21, 420-24. I have disregarded those medical source statements (as did the ALJ) because it appears that plaintiff was no longer treating with LCSW Stilman when she issued those opinions.

of homicidal thoughts (to shoot or stab people) and hearing voices. R. 590, 606. She reported that she had not been taking her prescribed medication over the past two months because Seroquel® was causing her to gain weight, and that she had lied to Dr. Abellard about her medication compliance. R. 590, 598. 606. Plaintiff also reported that she had taken "a handful" of Ativan® and two Seroquel® the night before (with thoughts of suicide), after a "manic phase" the previous day which "was especially intense and resulted in her kicking and hitting people, including her husband." R. 590, 598, 606. Plaintiff underwent a mental status examination by a consulting psychiatrist (Dr. Giurca), who observed that plaintiff was alert, oriented, calm and cooperative, and exhibited depressed mood, mood congruent affect and homicidal ideation. R. 606. Her speech was normal and her thought processes were logical and directed; she denied delusions. Id. Her insight was fair, her judgment was limited and her impulse control was poor. Id. Dr. Giurca diagnosed bipolar disorder, prescribed Zoloft® and perphenazine and recommended that plaintiff be hospitalized for safety reasons and medication stabilization. R. 450, 607.[17] She was transferred to Montefiore Mount Vernon Hospital's psychiatric ward. R. 438, 601.

The next day (December 1, 2013), the nursing staff reported that plaintiff was "cooperative and interactive with peers and staff" and exhibited "good behavioral control." R. 451. Plaintiff (who was writing fiction and publishing it online) read aloud excerpts from one of her writings; the reporting nurse noted that the writings were "organized, with discernable plot lines and character development." Id. On December 2, 2013, plaintiff complained of weakness

---

[17] Zoloft® is the brand name of Sertraline, an antidepressant medication. See MedlinePlus, at https://medlineplus.gov/druginfo/meds/a697048.html. Perphenazine (brand name Trilafon®) is an antipsychotic medication used to treat symptoms of schizophrenia. See id., at https://medlineplus.gov/druginfo/meds/a682165.html.

and feeling like she would pass out; a few hours later, she complained of dizziness and stated she "felt a little anxious." R. 453. Her medications were changed to Klonopin®, Ambien® and Celexa®. R. 462.[18] On December 3, 2013, plaintiff was calm and cooperative; she reported that she "feels well" and denied suicidal/homicidal ideation and hallucinations. R. 466. Plaintiff was discharged with prescriptions for Klonopin® and Celexa®, and with scheduled appointments to see Dr. Abellard and LCSW Passaro. R. 466-67, 472.

On December 4, 2013, Dr. Abellard noted that plaintiff's mood was depressed and anxious; she exhibited no perceptual disturbance or suicidal/homicidal ideation. R. 665. Her affect, psychomotor activity and speech were within normal limits, her thought processes were organized, her insight and judgment were limited and her impulse control was poor. Id.

Plaintiff met with LCSW Passaro on December 5, 2013. R. 544. Plaintiff was cooperative, her speech was normal and she demonstrated full range of affect. Id. Her thought process was coherent and her thought content was normal. Id. Her mood was irritable and anxious; her attention, concentration and judgment were good and her insight was fair. Id. Plaintiff "reported feeling better by the end of the session and agreed to take medications as prescribed." Id. Plaintiff returned to LCSW Passaro on December 10, 2013. R. 545. She spoke about "the book she is writing on the internet" loosely-based on the true story of two famous gentlemen; plaintiff stated she was excited because she would be seeing them at a book signing. Id. Her mental health evaluation was unchanged from the previous session. Id. The record

---

[18] Klonopin® is the brand name of Clonazepam, prescribed to relieve panic attacks. See MedlinePlus, at https://medlineplus.gov/druginfo/meds/a682279.html. Ambien® is the brand name of Zolpidem, prescribed for insomnia. See id., at https://medlineplus.gov/druginfo/meds/a693025.html. Celexa® is the brand name of Citalopram, an antidepressant. See id., at https://medlineplus.gov/druginfo/meds/a699001.html.

reflects five additional sessions with LCSW Passaro: two in December 2013 (December 19th and 27th); and three in January 2014 (January 7th, 23rd and 30th).  R. 546-50.  At each of those sessions, plaintiff's mental health evaluation remained unchanged.  Id.

On January 29, 2014, LCSW Passaro completed a medical source statement in which he identified plaintiff's symptoms as: sleep disturbance; personality change; mood disturbance; emotional lability; difficulty thinking or concentrating; social withdrawal or isolation; decreased energy; manic syndrome; generalized persistent anxiety; and hostility and irritability.  R. 432. LCSW Passaro rated plaintiff's capabilities to perform basic mental activities of work on a regular, continuing basis as follows:

> Moderate Loss:
> -remember locations and work-like procedures
> -understand and remember very short, simple instructions
> -carry out very short, simple instructions
> -make simple work-related decisions
> -interact appropriately with the public
> -ask simple questions or request assistance
> -maintain socially appropriate behavior
> -adhere to basic standards of neatness and cleanliness
> -travel in unfamiliar places
> -use public transportation
>
> Marked Loss:
> -understand and remember detailed instructions
> -maintain attention and concentration for extended periods, i.e. 2 hour segments
> -maintain regular attendance and be punctual
> -deal with stress of semi-skilled and skilled work
> -complete a normal workday or workweek w/o interruptions from psychologically-based
>     symptoms
> -perform at a consistent pace w/o an unreasonable number and length of rest periods
> -accept instructions and respond appropriately to criticism from supervisors
> -get along w/ coworkers and peers w/o unduly distracting them or exhibiting behavioral
>     extremes
> -respond appropriately to changes in a routine work setting
> -be aware of normal hazards and take appropriate precautions
> -set realistic goals or make plans independently of others

-18-

<u>Extreme Loss</u>:
-carry out detailed instructions
-sustain an ordinary routine without special supervision
-work in coordination w/ or proximity to others w/o being unduly distracted

R. 434-35. LCSW Passaro also indicated to what degree the following functional limitations

exist as a result of plaintiff's mental impairment:

-restriction of activities of daily living: NONE
-difficulties in maintaining social functioning: MODERATE
-difficulties in maintaining concentration/persistence/pace (resulting in failure to timely
   complete tasks): MARKED
-episodes of deterioration/decompensation in work, work-like settings which cause the
   individual to withdraw from that situation or to experience exacerbation of
   signs/symptoms: REPEATED

R. 435.

   The record contains treatment notes from six additional sessions with Dr. Abellard. R.

659-64. On December 13, 2013, plaintiff's mood was euthymic. R. 664.[19] Her affect,

psychomotor activity and speech were within normal limits, her thought processes were

organized and her impulse control was fair. <u>Id.</u> Dr. Abellard noted that plaintiff was "at

baseline." <u>Id.</u> On January 10, 2014, Dr. Abellard noted no changes in plaintiff's mental health

assessment except that her insight and judgment were limited. R. 663. Dr. Abellard noted that

plaintiff "seems to be at baseline." <u>Id.</u> On January 31, 2014, Dr. Abellard again noted plaintiff

was "at baseline." R. 662. Her mood was neutral and her insight/judgment were good;

otherwise, plaintiff's mental health assessment was unchanged. <u>Id.</u> On March 1, 2014, plaintiff

sought treatment from Dr. Abellard prior to her scheduled appointment because she was having

---

   [19] Euthymia is defined as "a normal, tranquil mental state or mood; specifically: a stable
mental state or mood in those affected with bipolar disorder that is neither manic nor
depressive." *Merriam-Webster Medical Dictionary*, accessed at
https://www.merriam-webster.com/medical/euthymia.

difficulty sleeping. R. 661. Her mood was depressed and her affect was anxious. Id. Her psychomotor activity and speech were within normal limits, her thought processes were organized, her insight and judgment were limited and her impulse control was poor. Id. Dr. Abellard increased plaintiff's dose of Celexa® and restarted Seroquel®. Id. On March 17, 2013, plaintiff reported: "Today I am good." R. 660. Her affect was appropriate, her speech was hyper-verbal, her psychomotor activity was within normal limits, her thought processes were organized, her insight and judgment were limited and her impulse control was fair. Id. Dr. Abellard noted that plaintiff "seems to be at baseline." Id. On April 14, 2014, plaintiff's mood was neutral; her affect, psychomotor activity and speech were within normal limits and her thought processes were organized. R. 659. Dr. Abellard noted that plaintiff "reports some down days but she is OK. No side effects." Id.

On January 13, 2014, Dr. Abellard completed a medical source statement in which he identified plaintiff's symptoms as: mood disturbance; anhedonia or pervasive loss of interest; feelings of guilt/worthlessness; difficulty thinking or concentrating; and hostility and irritability. R. 426. He opined that plaintiff's impairment would cause her to be absent from work more that three times a month. R. 427. Dr. Abellard rated plaintiff's capabilities to perform basic mental activities of work on a regular, continuing basis as follows:

No/Mild Loss:
-be aware of normal hazards and take appropriate precautions
-use public transportation

Moderate Loss:
-remember locations and work-like procedures
-understand and remember very short, simple instructions
-carry out very short, simple instructions
-sustain an ordinary routine without special supervision
-deal with stress of semi-skilled and skilled work
-make simple work-related decisions

-20-

-interact appropriately with the public
-ask simple questions or request assistance
-travel in unfamiliar places
-set realistic goals or make plans independently of others

Marked Loss:
-understand and remember detailed instructions
-carry out detailed instructions
-maintain regular attendance and be punctual
-work in coordination w/ or proximity to others w/o being unduly distracted
-complete a normal workday or workweek w/o interruptions from psychologically-based
     symptoms
-perform at a consistent pace w/o an unreasonable number and length of rest periods
-accept instructions and respond appropriately to criticism from supervisors
-get along w/ coworkers and peers w/o unduly distracting them or exhibiting behavioral
     extremes
-maintain socially appropriate behavior
-adhere to basic standards of neatness and cleanliness
-respond appropriately to changes in a routine work setting

Extreme Loss:
-maintain attention and concentration for extended periods, i.e. 2 hour segments

R. 428-29. Dr. Abellard also indicated to what degree the following functional limitations

exist as a result of plaintiff's mental impairment:

-restriction of activities of daily living: SLIGHT
-difficulties in maintaining social functioning: MODERATE
-difficulties in maintaining concentration/persistence/pace (resulting in failure to timely
     complete tasks): MARKED
-episodes of deterioration/decompensation in work, work-like settings which cause the
     individual to withdraw from that situation or to experience exacerbation of
     signs/symptoms: REPEATED

R. 429.

D. Consultative Opinions

    1. *Adam Brownfeld, Ph.D*

    On April 24, 2013, psychologist Adam Brownfeld conducted a consultative examination

of plaintiff. R. 310-14. Plaintiff reported difficulty falling/staying asleep, increased appetite

-21-

with weight gain, and nightmares a few times a week. R. 311. She also reported occasional passive suicidal ideation (the last one was one week prior), without plan or intent. Id. She claimed "anxiety-related symptoms" of excessive worry, fatigue, irritability and difficulty concentrating since age twelve. Id. Plaintiff stated that she has experienced panic attacks since the age of twelve, during which she has palpitations, nausea, sweating, dizziness, breathing difficulties, trembling "and her mind wanders and she feels stuck in place." Id. Her panic attacks are triggered when she knows she has to leave the house, and when she is in crowds. Id. Plaintiff "explained that it takes her 30 minutes to leave the house to go shopping and she feels safe at home." Id. She claimed memory deficits (short-term and long-term) and difficulty with concentration, learning new material, organization and planning. Id.

On mental status examination, plaintiff was alert and oriented, cooperative, well-groomed and appropriately dressed; she appeared her stated age and her presentation was adequate. R. 312. She exhibited normal motor behavior and appropriate eye contact; her speech was fluent and clear with appropriate language. Id. Plaintiff's thought processes were "[c]oherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." Id. Her affect was full, her mood was euthymic and her thought content was appropriate. Id. Dr. Brownfeld noted that plaintiff's attention and concentration were "intact" based on her ability "to perform counting, simple calculations, and her serial 3s." Id. According to Dr. Brownfeld, plaintiff's recent and remote memory skills were "[i]mpaired due to emotional distress secondary to depression," her cognitive functioning was average and her insight and judgment were good. R. 312-13. Dr. Brownfeld also noted that plaintiff is able to care for her personal needs, manage her money, cook and prepare food, and clean; she needs assistance with laundry (she gets confused about the appropriate amount of detergent), she cannot shop alone,

she cannot take public transportation alone, and her husband does most of the driving (although plaintiff is able to drive, but only if her husband is with her).  R. 313.  Plaintiff reported that she does not have friends and only socializes with her husband and mother.  Id.

Dr. Brownfeld evaluated plaintiff's functional abilities as follows:

No Limitation
-follow and understand simple directions and instructions
-perform simple task independently
-maintain attention and concentration

Mild Limitation
-maintain a regular schedule
-learn new tasks
-perform complex tasks independently (she needs supervision)
-make appropriate decisions
-relate adequately with others
-deal with stress appropriately

Id.  Dr. Brownfeld diagnosed bipolar disorder NOS (rule out panic disorder with agoraphobia), recommended that plaintiff continue psychological and psychiatric treatment, assessed her prognosis as "good" and opined that plaintiff's psychiatric problems do "not appear to be significant enough to interfere with [her] ability to function on a daily basis."  R. 313-14.

2.  State Agency Psychiatric Consultant J. Alpert

On May 21, 2013, state agency psychiatric reviewer J. Alpert prepared a consultative mental residual functional capacity assessment based upon his review of the record medical evidence.  R. 66-69 (repeated at 76-79).  Dr. Alpert assessed plaintiff's functional abilities as follows:

No Limitation
-understanding and memory
-social interactions

Not Significantly Limited
-carry out very short and simple instructions

-carry out detailed instructions
-maintain attention and concentration for extended periods
-sustain an ordinary routine without special supervision
-work in coordination with or proximity to others without being distracted by them
-make simple work-related decisions
-be aware of normal hazards and take appropriate precautions
-set realistic goals or make plans independently of others

Moderately Limited
-perform activities within a schedule, maintain regular attendance and be punctual within
        customary tolerances
-complete a normal workday and workweek without interruptions from psychologically
        based symptoms and to perform at a consistent pace without an unreasonable
        number and length of rest periods
-respond appropriately to changes in the work setting
- travel to unfamiliar places or use public transportation

R. 67-68, 77-78.  In sum, Dr. Alpert opined:

> The evidence in [the] file reveals that despite a severe impairment, the claimant
> retains the capacity to understand and follow directions, sustain
> attention/concentration for at least simple tasks and to respond and relate
> adequately to others and adapt to changes in the work environment.

R. 69, 78.

E. Plaintiff's Hearing Testimony

Plaintiff, who was 33 years old at the time of the hearing, lives with her husband in an

apartment on the second floor of the family house.  R. 33-34.  Plaintiff's mother lives on the

ground floor; her brother lives on the third floor.  R. 52.  Plaintiff has a driver's license but does

not drive because of her medication; her husband drove her to the hearing.  R. 34-35.  She

cannot take a cab or a bus by herself; someone is always with her if she has to go out.  R. 35.  At

the time of the hearing, plaintiff was being treated by Dr. Abellard and attended weekly therapy

sessions with LCSW Passaro.  R. 44-46.  She could not recall what medication she was taking

due to "memory issues."  R. 45.  The medications make her feel dizzy and drowsy.  R. 55.

From approximately 2005 to 2010, plaintiff worked full-time as a bank teller.  R. 36, 38.

-24-

She quit that job because she was being sexually harassed. R. 38. In July 2012, at the completion of a two-year program, plaintiff graduated from the Connecticut Center for Massage Therapy (but she does not have a state license to practice massage therapy). R. 35-36. Plaintiff's symptoms "escalated" during massage school. R. 43. She could not concentrate in class, she had no friends and she "just barely" passed her classes. Id. She had classes two days a week, all day, and drove herself to the school. R. 44. As part of the massage therapy program, students worked on each other and gave massages to residents at a senior living facility. Id.

Plaintiff suffers from depression (with highs and lows) and frequent panic attacks. R. 43. She has nightmares "maybe a few times a week." R. 55-56. She "always feels like there's someone following" her. Id. She has anger issues and has had homicidal thoughts, and she is "always hearing voices." R. 43, 48. The voices "are like a group of people telling me to kill someone, to like slice someone's throat or to grab someone's gun. Never good." R. 55. Plaintiff forgets "little things" every day: "Make sure like I lock the door. Doctor's appointments. Forget what day of the week it is." R. 56. She "can never concentrate on anything for too long," even a thirty-minute television show. Id. Her concentration problems make it difficult for her to follow written instructions: "I don't know whether or not to follow it. I mean, I could read it but it's not registering in my head." R, 57. Plaintiff has good days and bad days: on a "down" day she won't shower and will stay in her pajamas all day, either in bed or curled up on the couch; on an "up" day she will smile and she might walk the dog (with her husband). R. 48. Even on "up" days, plaintiff prefers to stay inside and–if she goes out–she is nervous about being followed. Id. According to plaintiff: "I usually carry a knife with me because I'm scared for my life but my lawyer [who represented plaintiff at the hearing] told me to leave it at home." R. 49.

Plaintiff still experiences pain from endometriosis, even after the surgery. R. 59-60. She described the pain as "crampy" and "burning," like a "hot poker inside that's trying to poke itself out." R. 59. Sometimes the pain causes her to "curl up in a ball on the floor." Id. She uses a heating pad or hot compress to help relieve some of the pain. Id. She experiences pain with intercourse. Id.

Plaintiff and her husband do the cooking, cleaning and shopping as "a team effort." R. 50. She never goes shopping by herself and she has not cleaned the house in a while. R. 58-59. According to plaintiff, she gets "preoccupied" if she does chores: "[L]et's say I start in the bathroom. And I'll start cleaning the bathroom. And then I don't know, I would lose concentration and then move from the bathroom to the kitchen and then start cleaning the kitchen. And then it's like wait, why am I in the kitchen? You know, I started with the bathroom but I never finished the bathroom. So it [sic] would move from one thing to the next without actually finishing it." R. 60. Plaintiff used to write fiction but can no longer do so; she may write "a line or two" but she cannot concentrate because she hears "so much chatter" in her head. Id. She spends a lot of time alone but also spends time with her family; her mother often comes upstairs to visit and her brother puts her to bed. R. 51-52, 57. Her brother (who is single) has two children (ages seven and eight); plaintiff tried babysitting them but it did not work out because, according to plaintiff, her brother does not trust her. R. 53. Plaintiff traveled once since July 2012: she flew to Florida with her husband, her mother and her brother's two children. R. 52-53. They were in Florida for ten days, during which time plaintiff "just stayed in a friend's house." R. 53-54.

## III. LEGAL STANDARDS

A. Standard of Review

In reviewing a decision of the Commissioner, a district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). See 42 U.S.C. § 1383(c)(3). "It is not the function of a reviewing court to decide de novo whether a claimant was disabled." Melville v. Apfel, 198 F.3d 45, 52 (2d Cir. 1999). Rather, the court's review is limited to "'determin[ing] whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard.'" Poupore v. Astrue, 566 F.3d 303, 305 (2d Cir. 2009) (quoting Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)).

The substantial evidence standard is "even more" deferential than the "'clearly erroneous' standard." Brault v. Soc. Sec. Admin, 683 F.3d 443, 448 (2d Cir. 2012). The reviewing court must defer to the Commissioner's factual findings and the inferences drawn from those facts, and the Commissioner's findings of fact are considered conclusive if they are supported by substantial evidence. See 42 U.S.C. § 405(g); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence is "'more than a mere scintilla'" and "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "If evidence is

-27-

susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." McIntyre v. Colvin, 758 F.3d 146, 149 (2d Cir. 2014) (citation omitted).

"However, where the proper legal standards have not been applied and 'might have affected the disposition of the case, the court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.'" Velez v. Colvin, No. 14 Civ. 3084, 2017 WL 1831103, at *15 (S.D.N.Y. June 5, 2017) (citing Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004)). Thus, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard," or when the ALJ's rationale is unclear in relation to the record evidence, remand to the Commissioner "for further development of the evidence" or for an explanation of the ALJ's reasoning is warranted. Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

When, as here, if a motion for judgment on the pleadings is unopposed (in the context of a Social Security benefits appeal), the Court may not grant the unopposed motion based merely upon the opposing party's failure to respond; rather, the Court "must review the record and determine whether the moving party has established that the undisputed facts entitle it to judgment as a matter of law." Martell v. Astrue, No. 09 Civ. 1701, 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010) ("[I]n light of the similarity between a motion for summary judgment and a motion on the pleadings in the present context, where there is a fulsome record of the underlying administrative decision, we look to the summary judgment context for guidance."). See also Ortiz v. Comm'r of Soc. Sec., No. 15 Civ. 7602, 2017 WL 519260, at *5 (S.D.N.Y. Feb. 8, 2017); McCreery v. Comm'r of Soc. Sec., No. 13 Civ. 3254, 2014 WL 3377099, at *4 (S.D.N.Y. July 9, 2014); Sepulveda v. Comm'r of Soc. Sec., No. 12 Civ. 4301, 2013 WL

6588452, at *2 (S.D.N.Y. Dec. 16, 2013).

B. Statutory Disability

A claimant is disabled under the SSA when he or she lacks the ability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In addition, a person is eligible for disability benefits under the SSA only if

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Social Security Regulations set forth a five-step sequential analysis for evaluating whether a person is disabled under the SSA:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of impairments;
> (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments;
> (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and
> (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

McIntyre, 758 F.3d at 150 (citing 20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920(a)(4)(I)-(v)).[20]

The claimant bears the burden of proof as to the first four steps of the process. See Burgess v.

---

[20] Many of the regulations and Social Security Rulings cited herein have been amended subsequent to the ALJ's decision. For the sake of brevity, I discuss (and have applied) the relevant regulations/rulings as they existed at the time of the ALJ's decision.

Astrue, 537 F.3d 117, 120 (2d Cir. 2008).  If the claimant proves that his impairment prevents

him from performing his past work, the burden shifts to the Commissioner at the fifth and final

step.  See Brault, 683 F.3d at 445.

Additionally, where a claimant suffers from an alleged mental impairment, the ALJ is

required to utilize a "special technique" at the second and third steps.  See Kohler v. Astrue, 546

F.3d 260, 265 (2d Cir. 2008); see also 20 C.F.R. §§ 404.1520a, 416.920a.  At step two, in

determining whether the claimant has a "severe impairment," the ALJ must rate the claimant's

degree of functional limitation in four areas: (1) activities of daily living; (2) social functioning;

(3) concentration, persistence, or pace; and (4) episodes of decompensation.  See Kohler, 546

F.3d at 266; 20 C.F.R. §§ 404.1520a(b)-(c), 416.920a(b)-(c).  If the claimant's mental

impairment or combination of impairments is severe, then at step three the ALJ must "compare

the relevant medical findings and the functional limitation ratings to the criteria of listed mental

disorders in order to determine whether the impairment meets or is equivalent in severity to any

listed mental disorder." Kohler, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(2)).  See also

20 C.F.R. § 416.920a(d)(2).  If the claimant suffers from a severe impairment which is not listed

(or equivalent in severity to a listed mental disorder), then the ALJ must assess the claimant's

residual functional capacity.  See Kohler, 546 F.3d at 266 (citing § 404.1520a(d)(3)).  See also

20 C.F.R. § 416.920a(d)(3).

## IV.  THE ALJ'S DECISION

To assess plaintiff's disability claim, the ALJ followed the five-step sequential analysis

and applied the "special technique" at steps two and three.  See 20 C.F.R. §§ 404.1520(a)(4)(i)-

(v), 416.920(a)(4)(i)-(v), 404.1520a, 416.920a and discussion, *supra*.  At step one, the ALJ

concluded that plaintiff had not engaged in substantial gainful activity since July 15, 2012, the

alleged onset date of her disability.  R. 16.  At step two, the ALJ concluded that plaintiff's mood

disorder and anxiety disorder constituted "severe impairments" within the meaning of the SSA.

Id.  The ALJ considered plaintiff's allegation that ovarian cysts limited her ability to work but

found that the evidence "does not establish ongoing pelvic or ovarian problems" post-surgery

and, therefore, that plaintiff's "status post ovarian cystectomies does not meet the duration

requirement."  R. 17.  See 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1509, 416.909.[21]

At step three, the ALJ determined that plaintiff's impairments (individually or combined)

do not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1.  R. 17.  Specifically, the ALJ found that plaintiff's mental

impairments, "considered singly and in combination, do not meet or medically equal the criteria

of listings 12.04 and 12.06."  Id.[22]  In making this finding, the ALJ first considered whether the

 "paragraph B" criteria are satisfied.  Id.  "To satisfy the 'paragraph B' criteria, the mental

impairments must result in at least two of the following: marked restriction of activities of daily

---

[21]  The ALJ also noted that the record contains evidence of plaintiff's "various and brief
complaints of back, right wrist, shoulder, and head pain" but found that, "[d]espite her
complaints, diagnostic imaging showed unremarkable results related to her lumbar and thoracic
spine and her right wrist and hand and physical examination findings were largely
unremarkable."  R. 17 (citing R. 392-95, 412-14, 417, 455-56).  The ALJ accordingly concluded
that plaintiff "does not have medically determinable back, right wrist, shoulder, or head
impairments."  Id.

[22]  Listing 12.04 is the listing for "Affective Disorders."  See 20 C.F.R. Pt. 404, Subpt. P,
App. 1, § 12.04.  An impairment qualifies as a listed impairment under Listing 12.04 when the
criteria in both paragraphs A and B of that listing are satisfied, or when the criteria in paragraph
C of that listing is satisfied.  See id.  Listing 12.06 is the listing for "Anxiety Related Disorders."
See id., § 12.06.  An impairment qualifies as a listed impairment under Listing 12.06 when the
requirements of both paragraphs A and B of that listing are satisfied, or when the requirements
of both paragraphs A and C of that listing are satisfied.  See id.

living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." Id. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06. The ALJ found that plaintiff has mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties with regard to concentration, persistence or pace, and "has experienced one to two episodes of decompensation, but none of which were of extended duration." R. 17-18. Thus, the ALJ concluded that the "paragraph B" criteria are not satisfied. R. 18. The ALJ also considered whether the "paragraph C" criteria are satisfied, and concluded that "the evidence fails to establish the presence of the 'paragraph C' criteria. Id.[23] Finally, before proceeding to step four, the ALJ noted that the limitations identified in the paragraph B criteria are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process, whereas the mental residual functional capacity ("RFC") assessment used at steps 4 and 5 "requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p)." R. 19. Accordingly, the ALJ noted that her RFC assessment at steps 4 and 5 "reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis." Id.

At step four, the ALJ concluded that plaintiff has the RFC to perform a full range of work

---

[23] With regard to the paragraph C criteria of listing 12.04, the ALJ found that plaintiff "does not have a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the claimant to decompensate; or a current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." R. 18. With regard to the paragraph C criteria of listing 12.06, the ALJ found that plaintiff's impairment "does not result in a complete inability to function independently outside the area of her home." R. 19.

at all exertional levels, with the nonexertional limitation that she can perform simple and repetitive tasks. R. 19.  In reaching this conclusion, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" and "opinion evidence" in accordance with 20 C.F.R. §§ 404.1527, 404.1529, 416.927 and 416.929 and Social Security Rulings 96-4p, 96-7p, 96-2p, 96-5p, 96-6p and 06-3p.  Id.  Overall, the ALJ determined that her RFC assessment "is supported by the objective medical evidence, the claimant's lack of full credibility regarding the intensity[,] persistence, and functionally limiting effects of her impairments, and the medical opinions from Dr Brownfeld and the State agency psychiatric consultant."  R. 23.  Finally, at step four, the ALJ determined that plaintiff is unable to perform any past relevant work.  Id.

At step five, the ALJ considered plaintiff's RFC, age, education and work experience in conjunction with the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. R. 24.  The ALJ concluded that jobs exist in significant numbers in the national economy that plaintiff can perform and, thus, found plaintiff "not disabled" as defined in the SSA.  Id.

## V.  ASSESSING THE ALJ'S DECISION

The Commissioner argues that she is entitled to judgment on the pleadings because substantial evidence supports the ALJ's decision.  However, based upon a thorough review of the administrative record, I conclude (for the following reasons) that the ALJ failed to apply the correct legal standards and, therefore, remand is warranted.

A.  Duty to Develop the Record

It is well-settled that the ALJ has an affirmative obligation to develop the record.  See Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009).  "Whether the ALJ has fulfilled his or her

duty to develop the record is a threshold issue." Matos v. Berryhill, No. 13 Civ. 5062, 2017 WL

2371395, at *15 (S.D.N.Y. May 4, 2017) (Report & Recommendation), *adopted* 2017 WL

2364368 (May 30, 2017).  The duty arises from the SSA regulations, which require the ALJ to

develop a claimant's "complete medical history" for at least twelve months prior to the month in

which the claimant filed an application for benefits.  See  20 C.F.R. §§ 404.1512(d), 416.912(b).

"The ALJ must therefore seek additional evidence or clarification where the documentation from

a claimant's treating physician, psychologist, or other medical source is inadequate to determine

whether the claimant is disabled." Velez, 2017 WL 1831103, at *15 (quotation marks, ellipses

and citations omitted).  "To be sure, the ALJ's general duty to develop the administrative record

applies even where the applicant is represented by counsel, but the agency is required

affirmatively to seek out additional evidence only where there are 'obvious gaps' in the

administrative record." Eusepi v. Colvin, 595 F. App'x 7, 9 (2d Cir. 2014) (citation omitted).

Additionally, "[t]he duty to develop the record is particularly important where an applicant

alleges he is suffering from a mental illness, due to the difficulty in determining whether these

individuals will be able to adapt to the demands or 'stress' of the workplace." Velez, 2017 WL

1831103, at *15 (quoting Hidalgo v. Colvin, No. 12 Civ. 9009, 2014 WL 2884018 at *4

(S.D.N.Y. June 25, 2014)).  See also Matos, 2017 WL 2371395, at *15; Clark v. Comm'r of Soc.

Sec., No. 15 Civ. 8406, 2017 WL 1162204, at *3 (S.D.N.Y. Mar. 27, 2017).

   In this case, it is clear that there are "obvious gaps" in the record regarding plaintiff's

mental health treatment, which the ALJ had a duty to develop further.  According to LCSW

Stilman's March 18, 2013 functional assessment, she conducted weekly therapy sessions with

plaintiff, beginning on February 25, 2013.  R. 302, 304.  In her second assessment (dated April

26, 2013), LCSW Stilman stated that she began treating plaintiff once a week on February 25,

2013, and had last treated plaintiff on April 17, 2013.  R. 377.  Additionally, plaintiff testified at

the hearing as follows:  she sees a therapist weekly; her current therapist is Mario Passaro;

before Mario, her therapist was "Carol" (whom plaintiff began seeing in February 2013); and she

had to switch from Carol to Mario for insurance reasons.  R. 46-48.  Plaintiff began treatment

with LCSW Passaro in November 2013.  R. 541.  Thus, the record suggests that plaintiff began

weekly therapy sessions with LCSW Stilman on February 25, 2013, which continued until

plaintiff switched therapists in November 2013.  However, apart from an initial evaluation dated

February 25, 2013 and questionnaires completed by plaintiff on February 25, 2013 and April 17,

2013, the record contains no treatment notes from LCSW Stilman.  Similarly, although it appears

from the record that plaintiff's weekly sessions with LCSW Passaro began in November 2013

and continued up to the time of the hearing (on March 14, 2014), the last treatment record from

LCSW Passaro is dated January 30, 2014.  R. 550.  There is no indication that the ALJ made any

follow-up attempts to address the obvious gaps and procure the missing treatment records from

LCSW Stilman and LCSW Passaro.  This was error.  Absent the benefit of a full complement of

treatment notes from these social workers, the ALJ could not have possessed a "complete

medical history" detailing the nature and severity of plaintiff's alleged impairments.  See Clark,

2017 WL 1162204, at *3-4 (complete medical record necessarily includes treatment notes from

"mental health professionals with the most frequent and sustained contact" with a claimant).

B.  Weight Afforded to Opinion Evidence

    *1. The Treating Physician Rule*

    "[A] treating physician's statement that the claimant is disabled cannot itself be

determinative."  Micheli v. Astrue, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting Snell v. Apfel,

177 F.3d 128, 133 (2d Cir. 1999)).  However, the ALJ must give "controlling weight" to a

"medical opinion" from a claimant's "treating source" if the treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the administrative record.  20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2).  See Greek v. Colvin, 802 F.3d 370, 375 (2d Cir. 2015).  A "treating source" is a claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. §§ 404.1502, 416.902.  "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairments, including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2).

> Where (as in this case) the treating physician is a mental health professional:

> the treating physician rule takes on added importance.  A mental health patient may have good days and bad days; she may respond to different stressors that are not always active.  Thus, the longitudinal relationship between a mental health patient and her treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single consultative examination.

Bodden v. Colvin, No. 14 Civ. 8731, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015).  See Maldonado v. Colvin, No. 15 Civ. 4016, 2017 WL 775829, at *19 (S.D.N.Y. Feb. 28, 2017); Vazquez v. Comm'r of Soc. Sec., No. 14 Civ. 6900, 2015 WL 4562978, at *14 (S.D.N.Y. July 21, 2015) ("[T]he treating physician rule is particularly important in the context of mental health because mental impairments are generally difficult to diagnose without subjective, in-person examination.") (quotation marks and citation omitted).

If an ALJ determines that a treating source's opinion is not entitled to controlling weight, the ALJ must consider the following factors in deciding what weight to accord that opinion: (1) the length of the treatment relationship and frequency of treatment; (2) the nature and extent of the treatment relationship; (3) explanations the source provides for the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) the treating source's specialization; and (6) any other factors brought to the ALJ's attention which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2). The ALJ need not recite each factor explicitly, provided the ALJ's decision reflects substantive application of the regulation. See Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."). However, an ALJ's failure to set forth "good reasons" for the weight accorded to a treating source opinion is a ground for remand. See Greek, 802 F.3d at 375.

Here, the ALJ gave "little to no weight to Dr. Abellard's opinions" (set forth in his January 13, 2014 medical source statement and LCSW Stilman's assessments dated March 18, 2013 and April 26, 2013, which Dr. Abellard co-signed), on the ground that they are "inconsistent with his own medication management notes throughout the period under consideration showing the claimant has typically been at baseline, except for one episode of decompensation when the claimant admitted to ceasing her medication on her own." R. 22, 302-08, 377-85, 426-30. First, it is a stretch to conclude that Dr. Abellard's treatment notes reflect that plaintiff has "typically" been at baseline "throughout the period under consideration." The first time Dr. Abellard observed that plaintiff might have been at baseline ("Pt is at baseline?") was on March 4, 2013, after three months of treatment. R. 677. During the next eight months of treatment, Dr. Abellard noted that plaintiff was "at baseline" three times: on July 19, 2013,

October 9, 2013 and November 6, 2013. R. 666-677, 670. Plaintiff was "at baseline" again on

December 13, 2013, January 10, 2014 and January 31, 2014. R. 662-64. On March 1, 2014,

plaintiff's mood was depressed, her affect was anxious, her insight and judgment were limited

and her impulse control was poor. R. 661. Dr. Abellard increased plaintiff's dose of Celexa®

and restarted Seroquel®. Id. On March 17, 2014, plaintiff "seem[ed] to be at baseline." R. 660.

Thus, although it appears that plaintiff was more consistently "at baseline" from December 2013

forward, it was hardly a "typical" notation during the prior year of treatment. In any event, the

precise meaning and significance of the phrase "at baseline" cannot be ascertained from the

record.[24] In sum, the ALJ failed to set forth "good reasons" for the weight accorded to Dr.

Abellard's opinions.

　　　　Moreover, the treating physician rule "is inextricably linked to the duty to develop the

record." Lacava v. Astrue, No. 11 Civ. 7727, 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27,

2012), *report and recommendation adopted*, No. 11 Civ. 7727, 2012 WL 6621722 (S.D.N.Y.

Dec. 19, 2012). Thus, "an ALJ cannot reject a treating physician's diagnosis without first

attempting to fill any clear gaps in the administrative record." Burgess, 537 F.3d at 129. See

also Selian v. Astrue, 708 F.3d 409, 420 (2d Cir. 2013) ("[T]he Commissioner has an affirmative

duty to fill any clear gaps in the administrative record before rejecting a treating physician's

---

　　[24] By emphasizing Dr. Abellard's findings that plaintiff was (at times) "at baseline," the
ALJ appears to equate a "baseline" finding with a finding that plaintiff has no functional
limitations or is otherwise "normal." However, as this Court understands it in this context, a
"baseline" merely "serves as a basis or reference point for observing behavior" and assessing the
effectiveness of interventions. See, e.g., Nugent, Pam M.S., "Baseline" defined in
PsychologyDictionary.org (April 7, 2013), available at
https://psychologydictionary.org/baseline/.

diagnosis.") (quotation marks and citation omitted).  In other words, "until an ALJ satisfies the threshold requirement under the duty to develop the record, the ALJ cannot even begin to discharge his duties under the treating physician rule." <u>Velez</u>, 2017 WL 1831103, at *17 (quotation marks, ellipses and citations omitted).  Accordingly, I conclude and respectfully recommend that this matter be remanded to the Commissioner in accordance with the discussion above, for further development of the administrative record concerning the missing treatment notes, followed by the proper application of the treating physician rule and a reconsideration of the weight afforded to Dr. Abellard's opinions, if they are not deemed controlling.

  2.  *Opinions of LCSW Stilman and LCSW Passaro*

   Under the relevant regulations, licensed clinical social workers ("LCSWs") are "medical sources who are not 'acceptable medical sources.'"  SSR 06-03P, 2006 WL 2329939, at *2 (SSA Aug. 9, 2006).  Although information from LCSWs "cannot establish the existence of a medically determinable impairment," it "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  <u>Id.</u>  Thus, "[o]pinions from these medical sources, . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  <u>Id.</u> at *3.  To that end, when evaluating opinions from LCSWs, the ALJ should consider the following factors (if they apply to a particular case):

- How long the source has known and how frequently the source has seen the individual;
- How consistent the opinion is with other evidence;
- The degree to which the source presents relevant evidence to support an opinion;
- How well the source explains the opinion;
- Whether the source has a specialty or area of expertise related to the individual's impairment(s);
- Any other factors that tend to support or refute the opinion.

Id. at *4-5.

Here, "as appropriate under SSR 06-03p," the ALJ considered the opinions of LCSWs Stilman and Passaro (set forth in Stilman's assessments dated March 18, 2013 and April 26, 2013 and Passaro's medical source statement dated January 29, 2014) and gave those opinions "no to little weight" on the ground that they "are not well-supported by the claimant's mental health treatment notes and mental status examination findings, and rather appear to be based on the claimant's subjective complaints." R. 22-23. The ALJ's justification for the weight accorded to these opinions is problematic: it was error to rely on the absence of supporting treatment notes as a key reason for assigning these sources "no to little weight" without first attempting to fill the obvious gaps in the record. Accordingly, I conclude and respectfully recommend that this matter be remanded to the Commissioner for a reassessment of the weight assigned to the opinions of LCSW Stilman and LCSW Passaro, following further development of the administrative record concerning the missing treatment notes and in accordance with the foregoing discussion.

### 3. Opinion of State-Agency Review Psychiatrist

Under SSA regulations, both examining and non-examining State agency medical consultants are deemed to be qualified experts for purposes of disability claims and, therefore, an ALJ may properly rely upon their opinions. See 20 C.F.R. §§ 404.1512, 404.1513, 404.1527, 416.912, 416.913, 416.927. However, "because nonexamining sources have no examining or treating relationship" with claimants, the weight to be accorded to their opinions "will depend on the degree to which they provide supporting explanations for their opinions" as well as "the degree to which [their] opinions consider all of the pertinent evidence . . ., including opinions of treating and other examining sources." 20 C.F.R. §§ 404.1527(e), 416.928(e).

Here, the ALJ gave "great weight" to the opinion of the State agency psychiatric consultant (Dr. Alpert), on the ground that it "is supported by the medical evidence of record and provides specific rationale." R. 22, 66-69, 76-79.[25]  Dr. Alpert's opinion is the only one to which the ALJ assigned "great weight."  The ALJ's heavy reliance on Dr. Alpert's opinion is problematic for several reasons.  First, the opinion is internally inconsistent: Dr. Alpert assessed that plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting (R. 68, 77); yet, he opined that plaintiff "retains the capacity" to, among other things, "adapt to changes in the work environment."  R. 69, 78.  Second, although Dr. Alpert considered the opinion of the examining consultant (Dr. Brownfeld), Dr. Alpert rendered his opinion almost eight months prior to Dr. Abellard's submission of his medical source statement.  "Great weight should not be accorded to the opinion of a non-examining State agency consultant whose opinion is based on an incomplete record that lacks the opinion of the claimant's primary treating psychiatrist."  Coleman v. Colvin, No. 14 Civ. 2384, 2015 WL 1190089, at *10 (S.D.N.Y. Mar. 16, 2015).  Finally, the ALJ's finding that Dr. Alpert's opinion is "is supported by the medical evidence of record" is illusory in light of the obvious gaps in the medical record.  Accordingly, I conclude and respectfully recommend that this matter be remanded to the Commissioner for a reassessment of the weight assigned to Dr. Alpert's opinion (including consideration of whether his opinion was rendered stale by subsequent events), following further development of the administrative record and in accordance with the foregoing discussion.

---

[25]  The ALJ also gave "some weight" to the opinion of Dr. Brownfeld, the examining consultant.  R. 22, 310-14.  I discern no error with respect to the ALJ's allocation of weight to Dr. Brownfeld's opinion.

C.  Credibility Determination

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports

of pain and other limitations into account, but is not required to accept the claimant's subjective

complaints without question; he may exercise discretion in weighing the credibility of the

claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46,

49 (2d Cir. 2010) (internal citations omitted).  In deciding how much weight to give to a

claimant's subjective complaints, the ALJ must follow a two-step process set forth in the Social

Security regulations:

> At the first step, the ALJ must decide whether the claimant suffers from a
> medically determinable impairment that could reasonably be expected to produce
> the symptoms alleged.  20 C.F.R. § 404.1529(b).  That requirement stems from
> the fact that subjective assertions of pain alone cannot ground a finding of
> disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an
> impairment, at the second step, the ALJ must consider the extent to which the
> claimant's symptoms can reasonably be accepted as consistent with the objective
> medical evidence and other evidence of record.  Id.  The ALJ must consider
> statements the claimant or others make about his impairment(s), his restrictions,
> his daily activities, his efforts to work, or any other relevant statements he makes
> to medical sources during the course of examination or treatment, or to the
> agency during interviews, on applications, in letters, and in testimony in its
> administrative proceedings.  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. §
> 404.1529(a); S.S.R. 96–7p.

Genier, 606 F.3d at 49 (internal quotation marks and brackets omitted).[26]  "[W]here the ALJ

---

[26]  Effective March 28, 2016, S.S.R. 96-7p was superceded by S.S.R. 16-3p for the
purpose of providing
> guidance about how [to] evaluate statements regarding the intensity, persistence,
> and limiting effects of symptoms in disability claims."  S.S.R. 16-3P, 2016 WL
> 1119029, at *1.  . . .  S.S.R. 96-7p . . . placed a stronger emphasis on the role of
> the adjudicator to make a "finding about the credibility of the individual's
> statements about the symptom(s) and its functional effects."  S.S.R. 96-7P, 1996
> WL 374186, at *1.  In contrast, S.S.R. 16-3p espouses a more holistic analysis of
> the claimant's symptoms, and "eliminate[s] the use of the term 'credibility' " from
> sub-regulation policy.  S.S.R. 16-3P, 2016 WL 1119029, at *1.  The
> Commissioner notes that the "regulations do not use this term," and by

finds that the medical evidence does not substantiate the claimant's allegations [of pain and other limitations], the ALJ must assess the claimant's credibility by considering seven factors enumerated in the Social Security regulations." Rivera v. Astrue, No. 10 CV 4324, 2012 WL 3614323, at *14 (E.D.N.Y. Aug. 21, 2012).  These factors are:

> (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

Meadors v. Astrue, 370 F. App'x 179, 184 n.1 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c) (3)(I)-(vii)).  See also 20 C.F.R. § 416.929(c).

Here, the ALJ determined that plaintiff "is not fully credible" based upon an application of the proper legal standards.  R. 19, 21-22.  However, in light of the ALJ's failure to develop the administrative record, her findings regarding plaintiff's credibility cannot be sustained without further inquiry into the conditions that may have caused her to experience debilitating symptoms.  Accordingly, I conclude and respectfully recommend that this matter be remanded to the Commissioner for a reassessment of plaintiff's credibility following development of the record as discussed herein.

---

abandoning it, "clarif[ies] that subjective symptom evaluation is not an examination of an individual's character."  Id.
Acosta v. Colvin, 15 Civ. 4051, 2016 WL 6952338 at *18 (S.D.N.Y. Nov. 28, 2016).
   The ALJ issued her decision in the instant case prior to the effective date of S.S.R. 16-3p.

## VI.  CONCLUSION

For the reasons set forth above, I respectfully recommend that defendant's motion for judgment on the pleadings be **DENIED** and that the case be **REMANDED** for further administrative proceedings consistent with this Report and Recommendation pursuant to 42 U.S.C. § 405(g), sentence four.[27]

Dated:  July 28, 2017                              Respectfully Submitted,
      White Plains, New York

                                          PAUL E. DAVISON, U.S.M.J.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days, plus an additional three (3) days pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days from service of this Report and Recommendation to serve and file written objections.  See also Fed. R. Civ. P. 6(a).  Such objections, if any, along with any responses to the objections, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of the Honorable Cathy Seibel, at the

---

[27]  In the interest of providing additional guidance on remand, I note that, without the missing treatment notes, "it would be difficult if not impossible for ALJ [Edgell] to properly analyze the criteria of Listings 12.04 and 12.06 for mental impairments under the SSA's own regulations."  Velez, 2017 WL 1831103, at *16.  Additionally, the ALJ's summary of the objective medical evidence contains two factual errors.  First, the ALJ noted that Dr. Abellard's initial examination findings "were unremarkable other than an anxious mood" (R. 20); in fact, he noted that plaintiff's insight, judgment and impulse control were "fair."  R. 687-88.  Second, the ALJ noted that LCSW's Stilman's initial examination findings were "normal" (R. 20); in fact, she noted that plaintiff "had homicidal thoughts but no plans."  R. 371.

Honorable Charles L. Brieant, Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, New York 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.

A copy of this Report and Recommendation has been mailed to:

Elizabeth Rose Rizzo
18 Madeleine Ave.
New Rochelle, NY 10801